IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM F. RUSSELL, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>  v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, also known as NCAA; COLLEGIATE LICENSING COMPANY, also known as CLC; and ELECTRONIC ARTS, INC.,<br><br>    Defendants.<br>_____/ | No. C 11-4938 CW<br><br>ORDER DENYING DEFENDANT NCAA AND CLC'S MOTION TO DISMISS<br>(Docket No. 6) |

    Plaintiff William F. Russell charges Defendants the National Collegiate Athletic Association, also known as NCAA, the Collegiate Licensing Company, also known as CLC, and Electronic Arts, Inc. with engaging in anti-competitive conduct in violation of the Sherman Act.  He also asserts related common law claims against them for unjust enrichment and accounting.  NCAA and CLC move to dismiss Plaintiff's complaint in its entirety.  Plaintiff opposes the motion.  Having considered the arguments set forth by the parties in their papers and at the hearing in this matter, the Court DENIES NCAA and CLC's motion.

BACKGROUND

    Plaintiff's allegations against NCAA and CLC are almost identical to those brought by the Antitrust Plaintiffs in the related consolidated case currently pending before this Court, In

re NCAA Student-Athlete Name & Likeness Licensing Litigation, Case No. 09-1967 (N.D. Cal.).

NCAA, an unincorporated association of various colleges, universities and regional athletic conferences, governs collegiate athletics and is headquartered in Indiana. CLC, which is incorporated and headquartered in Georgia, allegedly handles NCAA's licensing agreements.

Plaintiff, a Washington resident, competed as a student athlete on the University of San Francisco (USF) men's basketball team from 1953 to 1956. He maintains that, during that time, he competed "pursuant to the NCAA's rules and regulations," and that he signed one or more release forms "that the NCAA has interpreted as a release of the student-athlete's rights with respect to his image, likeness and/or name in connection with merchandise sold by the NCAA, its members and/or its licensees." Compl. ¶ 31.

Plaintiff alleges that NCAA's rules and regulations constitute anti-competitive conduct. He states that NCAA requires student-athletes to sign NCAA Form 08-3a, or a form similar to it, each year prior to participating in intercollegiate athletics events. By signing Form 08-3a or a form like it, student athletes agree to the following:

> You authorize the NCAA [or a third party acting on behalf of the NCAA (e.g., host institution, conference, local organizing committee)] to use your name or picture to generally promote NCAA championships or other NCAA events, activities or programs.

Compl. ¶ 70 (bracketed text in original). This statement reflects NCAA Bylaw Article 12.5.1.1.1, which provides,

> The NCAA [or a third party acting on behalf of the NCAA (e.g., host institution, conference, local organizing committee)] may use the name or picture of an enrolled

2

> student-athlete to generally promote NCAA championships or other NCAA events, activities or programs.

Compl. ¶ 63. Form 08-3a states that a student-athlete's release "shall remain in effect until a subsequent Division I Student-Athlete Statement/Drug-Testing Consent form is executed," which Plaintiff alleges Defendants have interpreted as having the effect of allowing the release to exist in perpetuity. Id. at ¶¶ 17-18, 71.

Plaintiff claims that, among other things, Form 08-3a and Article 12.5.1.1 enable NCAA and CLC to enter into licensing agreements with companies, such as EA, that distribute products containing student-athletes' images, likenesses and names, even after the student-athletes have ended their collegiate athletic careers. He alleges that neither he nor other student athletes consent to these agreements, and that they do not receive compensation for the use of their images.

In the complaint, Plaintiff brings two counts of Sherman Act violations, asserting that Defendants' actions constitute anticompetitive conduct in two ways. First, he contends that Defendants conspired to "limit and depress the compensation of former student-athletes for continued use of their images to zero." Compl. ¶ 239. Second, Plaintiff asserts that Defendants engaged in a "group boycott / refusal to deal" scheme, in which Defendants required "all current-student athletes to sign forms each year that purport to require each of them to relinquish all

3

rights in perpetuity for use of their images, likenesses and/or names" and denied class members "compensation in the form of royalties for the continued use of their images, likenesses, and/or names for profit." Id. at ¶¶ 245-46.

Plaintiff brings the following claims against all Defendants (1) violation of § 1 of the Sherman Act for an unreasonable restraint of trade; (2) violation of § 1 of the Sherman Act for a group boycott and refusal to deal; (3) unjust enrichment; and (4) an accounting.

In the related consolidated case, this Court has considered the sufficiency of almost identical allegations in two motions to dismiss brought by these Defendants. See Order on NCAA's and CLC's Mots. to Dismiss, Docket No. 151, In re NCAA Student-Athlete Name & Likeness Licensing Litigation, Case No. 09-1967 (N.D. Cal. Feb. 8, 2010) (Feb. 8, 2010 Order); Order Granting EA's Mot. to Dismiss and Denying CLC's and NCAA's Mots. to Dismiss, Docket No. 325, In re NCAA Student-Athlete Name & Likeness Licensing Litigation, Case No. 09-1967 (N.D. Cal. May 5, 2011) (May 5, 2011 Order).

## LEGAL STANDARD

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). On a motion under Rule 12(b)(6) for failure to state a claim, dismissal is appropriate only when the complaint does not give the defendant fair notice of a legally cognizable

4

claim and the grounds on which it rests. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). In considering whether the complaint is sufficient to state a claim, the court will take all material allegations as true and construe them in the light most favorable to the plaintiff. NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986). However, this principle is inapplicable to legal conclusions; "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not taken as true. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009) (citing Twombly, 550 U.S. at 555).

When granting a motion to dismiss, the court is generally required to grant the plaintiff leave to amend, even if no request to amend the pleading was made, unless amendment would be futile. Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc., 911 F.2d 242, 246-47 (9th Cir. 1990). In determining whether amendment would be futile, the court examines whether the complaint could be amended to cure the defect requiring dismissal "without contradicting any of the allegations of [the] original complaint." Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990).

## DISCUSSION

NCAA and CLC seek to dismiss Plaintiff's claims on the grounds that they are barred by the statute of limitations and that Plaintiff has not adequately alleged an agreement between the NCAA and any third party.

5

I. Statute of Limitations

NCAA and CLC contend that Plaintiff's complaint includes allegations related to two separate and distinct anticompetitive schemes. They state the first took place in the 1950s when NCAA allegedly restrained competition among schools for Plaintiff's athletic services by preventing him from negotiating for a share in post-graduation licensing revenue. They seek to distinguish a second category of wrongdoing, which took place later, when NCAA allegedly entered into agreements with third parties to use his image without compensating him. Because the first type of wrongdoing was purportedly completed in 1956 when Plaintiff graduated from USF, NCAA and CLC state that claims based on it are barred by the statute of limitations.

NCAA and CLC ask this Court to analyze these allegations in isolation and separately as to each of Plaintiffs' Sherman Act claims. However, such an approach is contrary to the Supreme Court's direction that "[i]n cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962), superseded by statute on other grounds, Pub.L. No. 97-290, 15 U.S.C. § 6(a)). See also id. (quoting American Tobacco Co. v. United States, 147 F.2d 93, 106 (6th Cir. 1944)) ("'(T)he character and effect of a conspiracy are not to be judged by dismembering it and viewing its

6

separate parts, but only by looking at it as a whole.'") (parentheses in original).

Viewing the complaint as a whole, Plaintiff has alleged an overarching conspiracy in which NCAA and its co-conspirators have worked together to depress to zero the amount paid to student-athletes for their likenesses in perpetuity and to refuse to deal with them altogether. Instead of forming two separate and unrelated categories of allegations, the allegations to which NCAA and CLC point simply concern different actions that were taken in furtherance of the overall, multifaceted conspiracy. See Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 990 (9th Cir. 2000) (noting that "[a]ntitrust violations frequently entail multiple means and objectives (e.g., restraining both purchase prices and sales prices or boycotting to enforce price stabilization)" and cautioning that "[t]he law requires that every conspiracy be judged as a whole").

NCAA and CLC put forward several arguments in favor of dividing Plaintiff's allegations into two separate schemes. Defendants argue that each scheme involves different actors: the first "among NCAA member schools" and the second among "NCAA, CLC, EA and various third parties." Reply, at 5-6. However, Plaintiff makes numerous factual allegations that NCAA is a primary part of the purported first conspiracy along with its member schools. See, e.g., Compl. ¶¶ 63-75, 81-94 (describing how NCAA, through its rules and forms, requires student-athletes to relinquish the

7

relevant rights in order to be eligible to participate in college basketball). Further, NCAA and CLC cite no support for any argument that Plaintiff must allege that all involved in the conspiracy participated in each part of it. To the extent that NCAA and CLC suggest that CLC could not have been part of any conspiracy related to the activities that happened before it was founded,[1] Defendants do not acknowledge that a defendant can be held liable for joining an ongoing conspiracy.

NCAA and CLC also argue that the two different conspiracies resulted in different injuries. They state that the harm Plaintiff suffered from the first conspiracy was that schools did not compete for his services in the 1950s and that his harm from the second is that media entities did not compete for the right to use his likeness within the last decade. However, the harm is not so easily divisible, and Plaintiff clearly alleges in the complaint that the harm and collective effect of the overall conspiracy is that he, like other players, has been prevented from sharing in licensing revenue obtained through the use of his college likeness on an ongoing basis.

---

[1] With its reply, CLC requests judicial notice of documents showing that it was first formed in 1983 as Collegiate Concepts, Inc. (CCI). The documents are certified copies, from the Georgia Secretary of State, of Articles of Incorporation and a Certificate of Merger between CCI and CLC. Plaintiff has not filed an evidentiary objection to CLC's reply evidence. Accordingly, the Court GRANTS CLC's request.

8

Plaintiff contends that his claims are not barred by the statute of limitations, because the continuing violation doctrine applies, as this Court has previously found regarding the complaint in the related case:

> O'Bannon alleges that NCAA continues to enter into agreements that allow the use of his image without compensation paid to him. He claims that in 2007, NCAA entered into an agreement with Thought Equity Motion, Inc. to offer "classic" college basketball games online. O'Bannon Compl. ¶¶ 108-111. This supports an inference that the image of O'Bannon as a former college basketball player was included in that agreement. Thus, O'Bannon has sufficiently alleged a continuing violation.

Feb. 8, 2010 Order, at 10-11. Plaintiff has made the same allegations here. See Compl. ¶¶ 116-119. Plaintiff has also made more specific allegations, including that footage from specific games in which he played and at least fifty-four video-clips featuring his collegiate image currently appear on Thought Equity Motion's website. Id. at ¶¶ 32, 34. See also id. at ¶¶ 36, 38.

Plaintiff's claims were tolled on July 21, 2009, when the original complaint was filed in O'Bannon v. National Collegiate Athletic Association, Case No. 09-3329, on behalf of a class of which Plaintiff is a member. See American Pipe and Construction Co. v. Utah, 414 U.S. 538, 552-55 (1974); Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 349 (1983). Because Plaintiff has alleged continuing violations that took place before that date, within the applicable statute of limitations, his claims predicated on the overall conspiracy are not time-barred.

9

To argue against the application of this doctrine, NCAA and CLC cite Newman v. Universal Pictures, 813 F.2d 1519 (9th Cir. 1987). However, Newman is inapplicable to the facts in this case and does not discuss the continuing violations doctrine. In Newman, the complaint alleged a conspiracy that began years after the plaintiffs had signed certain contracts, when the defendants subsequently agreed to adopt an interpretation of the contracts that minimized payment to the plaintiffs. Id. at 1522. The Ninth Circuit held that the alleged conspiracy could not have restrained trade in the form of competition for film contracts, because the plaintiffs entered into the contracts before the conspiracy arose. Id. Here, Plaintiff alleges that there was a conspiracy already underway at the time that he was forced to sign a document like Form 08-3a and that it has been ongoing since that time.

Accordingly, the Court finds that Plaintiff's claims are not barred by the statue of limitations.

II. Sufficiency of Allegation of Agreements

NCAA and CLC argue that Plaintiff has not sufficiently plead an agreement between them and their alleged co-conspirators. In support, NCAA and CLC first contend that the Court should construe Plaintiff's allegations as two separate and distinct conspiracies and therefore should disregard the NCAA forms and bylaws. The Court finds this argument unpersuasive for the reasons previously stated.

NCAA and CLC also raise a number of evidentiary arguments inappropriate in a motion to dismiss. NCAA and CLC argue that there was no precursor form similar to Form 08-3a at the time that Plaintiff was a student-athlete and that he should be required to prove that he did sign such a form. NCAA and CLC also contend that Plaintiff will not ultimately be able to prove his allegations involving Thought Equity Motion. On a motion to dismiss, the Court is bound to take the allegations in the complaint as true. These evidentiary arguments are more properly addressed to a motion for summary judgment, and the Court declines to convert the instant motion to a motion for summary judgment under Federal Rule of Procedure 12(h).

NCAA and CLC further argue that the allegations against them are descriptions of their commercial efforts and as such are insufficient to show an agreement. However, the Court has already considered materially identical allegations against NCAA and CLC in the O'Bannon case and rejected the contention that they are insufficient to show an agreement. See Order on NCAA's and CLC's Motions to Dismiss, at 6-7. The Court finds no reason to arrive at a contrary conclusion now.

To the extent that NCAA and CLC maintain that, because discovery has been ongoing in the O'Bannon case, Plaintiff should be held to a more stringent pleading standard here than that typically applied when considering a motion to dismiss, NCAA and

11

CLC fail to provide any authority to support their argument, and the Court declines to utilize a heightened standard.

Further, although NCAA and CLC argue that Plaintiff failed to allege that forms similar to Form 08-3a or those signed pursuant to current Bylaw 12.5.1.1 existed in the 1950s when he was a player, Plaintiff has in fact made such claims. He alleges that the NCAA requires "all student-athletes to sign a form each year--such as 2008's 'Form 08-3a'--that purports to require each of them to relinquish all rights in perpetuity to the commercial use of their images." Compl. ¶ 15. Plaintiff also alleges that, while playing basketball at USF, he "signed one or more of the release forms discussed herein (or the precursors to them, including scholarship and eligibility papers that the NCAA has interpreted as a release of the student-athlete's rights with respect to his image, likeness and/or name . . .)." Compl. ¶ 31. If this is taken as true, Plaintiff has sufficiently alleged that NCAA did have and require such a form "each year," including in those years in which Plaintiff played collegiate basketball, and that he was signed them.

Accordingly, the Court finds that Plaintiff has sufficiently alleged his claims.

CONCLUSION

For the reasons set forth above, Defendants NCAA and CLC's Motion to Dismiss is DENIED (Docket No. 6).

IT IS SO ORDERED.

Dated: 5/16/2012

CLAUDIA WILKEN
United States District Judge